## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONNA COSCIA, administratrix of the estate of JASON COSCIA, Plymouth Probate Court Docket # 08P-0409AD1,<br>        Plaintiff,<br><br>    v.<br><br>THE TOWN OF PEMBROKE, MASSACHUSETTS, MICHAEL OHRENBERGER, CHARLES MULRAIN, STEPHEN KIRBY, RICHARD WALL, and PAUL TROSTEL,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 09cv11270-NG |

GERTNER, D.J.

### MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

### TABLE OF CONTENTS
June 4, 2010

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

II.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

III.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

IV.     DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        A.    Deliberate Indifference Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        B.    Risk and Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        C.    Failure to Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        D.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
        E.    Liability for Harm Outside of Police Custody . . . . . . . . . . . . . . . . . . -13-
        F.    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
        G.    Supervisory Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
        H.    Municipal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DONNA COSCIA, administratrix of the** ) <br> **estate of JASON COSCIA, Plymouth** ) <br> **Probate Court Docket # 08P-0409AD1,** ) <br>     **Plaintiff,** ) <br> ) <br>    **v.** ) <br> ) <br> **THE TOWN OF PEMBROKE,** ) <br> **MASSACHUSETTS, MICHAEL** ) <br> **OHRENBERGER, CHARLES** ) <br> **MULRAIN, STEPHEN KIRBY,** ) <br> **RICHARD WALL, and PAUL** ) <br> **TROSTEL,** ) <br>     **Defendants.** ) | **Civil Action No. 09cv11270-NG** |

**GERTNER, D.J.**

## MEMORANDUM AND ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
June 4, 2010

## I.     INTRODUCTION

This case involves disturbing allegations about the hours preceding a young man's suicide. Police in Pembroke, Massachusetts, arrested 21-year-old Jason Coscia ("Coscia") following a single-car accident. While detained, Coscia made numerous suicide threats, at one point telling police officers that he wanted to jump in front of a train and die. He also tried to lick an electrical outlet, hit and kicked the walls, and attempted to bite off his handcuffs. Officers placed him in leg restraints and determined that there was "a very high risk" he would kill himself. Nevertheless, the police released him that evening without ever offering medical care. The next morning, he committed suicide by doing what he said he would do -- walking in front of a train.

Coscia's estate ("plaintiff" or "the estate") sued officers at the station, supervisors, and the Town of Pembroke ("the town"), under 42 U.S.C. § 1983**,** claiming that their actions violated his federal constitutional rights.  Specifically, plaintiff asserts that individual defendant officers and supervisors were deliberately indifferent to Coscia's medical needs, and further, that the town failed to train officers to prevent detainee suicides.  Defendants move for judgment on the pleadings on the grounds that Coscia had no constitutional right to protection from private violence outside of police custody, that individual officers are entitled to qualified immunity, and that the estate has not stated a valid claim for supervisory or municipal liability.

There is no question that police officers violate a detainee's due process rights "if they display a 'deliberate indifference' to the unusually strong risk that a detainee will commit suicide."  Bowen v. City of Manchester, 966 F.2d 13, 16 (1st Cir. 1992) (citations omitted).  And officers can be held liable if they know of such a risk and fail to take obvious steps to address it. Id. at 17.  Defendants, however, seek to distinguish this case from other detainee suicide cases, simply because the plaintiff's suicide occurred outside of their custody.  But if the location of the suicide were dispositive, the police could release anyone they knew to be suicidal, thus avoiding liability; an outcome plainly inconsistent with the proscription against treating detainees with "deliberate indifference."  The relevant question is not the *location* of the suicide, but rather *causation* -- whether the officers' actions, if they were found to be deliberately indifferent, "were a cause in fact and a proximate cause of [the] suicide."  Conn v. City of Reno, 591 F.3d 1081, 1091 (9th Cir. 2010).  While it may be harder to prove that a suicide outside of police custody was causally related to the officers' acts, it is surely not implausible, particularly on the facts in the case at bar.

In its pleadings, the estate presents a plausible version of the facts on both fronts, the failure to take basic steps to assist Coscia and the causal relationship between those steps and Coscia's suicide.  Thus, at this very preliminary stage, the allegations are clearly actionable under 42 U.S.C. § 1983 and do not entitle the officers to a finding of qualified immunity.  Nor are the supervisory and municipal liability claims deficient as a matter of law.  Accordingly, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings (document #40).

## II.    STANDARD OF REVIEW

Motions for judgment on the pleadings by defendants under Rule 12(c) are similar to motions to dismiss under Rule 12(b)(6).  The only significant difference is that a 12(c) motion "implicates the pleadings as a whole," rather than only the complaint.  Aponte-Torres v. Univ. of Puerto Rico, 445 F.3d 50, 54-55 (1st Cir. 2006).  Facts in the pleadings must be construed in the light most favorable to the nonmoving party, with all reasonable inferences drawn in favor of that party.  Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  The amended complaint must give defendants "fair notice" of the claims and the grounds on which they rest.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Furthermore, it should "raise a right to relief above the speculative level, on the assumption that all the allegations . . . are true."  Id. (citations omitted).  A court should dismiss a case at the pleading stage only if the claims are not plausible in light of obvious alternative explanations for the challenged actions and factual allegations that merely recite the elements of the claims.  Chao v. Ballista, 630 F. Supp. 2d 170, 177 (D. Mass. 2009).

III.     **BACKGROUND**

The estate asserts that on the morning of December 9, 2007, Coscia was in a single-car accident in Pembroke, Massachusetts.  Am. Compl. ¶ 12.  At 11:00 a.m., defendant police officers Steven Kirby ("Kirby") and Charles Mulrain ("Mulrain") arrested him.  Id.  While Coscia rode in the police car to the Pembroke Police Station, he told police officers "that he was going to kill himself, and that he just wanted to jump in front of a train and end his life."  Id. ¶ 14.  He made more suicide threats at the station, and in one instance said he would "kill himself in the cell any way he could."  Id. ¶¶ 14-15.  The officers at the station included defendants Kirby, Mulrain, Paul Trostel ( "Trostel"), Michael Horvath ("Horvath"), and Richard Wall ("Wall").  Id. ¶ 13.  They observed him hit plexiglass and a wall with an injured hand, kick the walls, try to bite off his handcuffs, and try to lick an electrical outlet.  Id. ¶ 16.  The officers placed him in leg restraints and decided not to put him in a cell.  Id. ¶ 17.  They added information about Coscia's suicidal behavior to a computer system and a folder.  Id. ¶ 18.  The officers also used a suicide evaluation form and gave Coscia a score of 23, which corresponds to "a very high risk."  Id. ¶ 19.  Chief of Police Michael Ohrenberger ("Ohrenberger") learned of Coscia's actions and statements at approximately 2:10 p.m.  Id. ¶ 20.

None of the officers, however, took any action to obtain medical assistance for Coscia.  Id. ¶ 21.  Instead, they simply released him at 6:08 p.m.  Id.  The following morning, at approximately 7:50 a.m., Coscia walked in front of a train and died.  Id. ¶ 23.  According to plaintiff, the officers caused this incident by not taking appropriate actions to prevent it.  Id. ¶¶ 22, 28.

At the time of Coscia's suicide, detainee suicides were a "well known national problem." Id. ¶ 36.  Indeed, the police department had a written policy for the issue.  Id. ¶ 42.  The policy provided that "[a]ny detainee who exhibits any signs or symptoms of suicidal behavior should be transported to the nearest available hospital or medical facility for evaluation."  Id. ¶ 43; Pembroke Police Department General Order No. 329.00 at 11 (document #19-3).  But the officers, according to the complaint, were not trained to do what their own policy required, namely obtain medical assistance or take suicidal individuals to a medical facility.  Am. Compl. ¶¶ 37-38.

## IV.    DISCUSSION

### A.    Deliberate Indifference Standard

Police officers violate the Due Process Clause of the Fourteenth Amendment if they exhibit deliberate indifference to an "unusually strong risk that a detainee will commit suicide." Bowen, 966 F.2d at 16.  A plaintiff may establish deliberate indifference in a detainee suicide case by showing: (1) "an unusually serious risk of . . . self-inflicted harm"; (2) actual knowledge of the risk; and (3) "failure to take obvious steps to address" the risk.  Bowen (quoting Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992)).[1]  In addition, the plaintiff must prove that the defendants' actions or omissions were a cause in fact and a proximate cause of the

---

[1] The First Circuit has also remarked that the second element may be satisfied if the officers "reasonably should have known" about an elevated risk of suicide, Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir. 1991), or were "willful[ly] blind[]" to such a risk, Manarite, 957 F.2d at 956.  However, it is unclear whether these alternate showings are sufficient in light of the Supreme Court's later holding that prison officials must be subjectively aware of a "substantial risk of serious harm" in order to be held liable under the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 847 (1994); see also Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007); Mahan v. Plymouth County House of Corr., 64 F.3d 14, 18 (1st Cir. 1995).

suicide.  <u>Conn</u>, 591 F.3d at 1091; <u>see also</u> <u>Rodriguez-Cirilo v. Garcia</u>, 115 F.3d 50, 52-53 (1st

Cir. 1997) (describing causation requirements in section 1983 cases).

### B.     Risk and Knowledge

The facts alleged provide a plausible basis for a finding of both risk and knowledge.

Coscia's suicide threats in the police car and at the station -- including a suggestion that he

would jump in front of a train -- certainly go a long way in establishing these elements.  The

Eleventh Circuit, for example, has found that suicide threats made to a police officer were

enough, at the summary judgment stage, to establish a serious risk of suicide and knowledge of

that risk.  <u>Cagle v. Sutherland</u>, 334 F.3d 980, 989 (11th Cir. 2003) (proceeding to a discussion of

whether a jailer's subsequent acts established deliberate indifference).  One commentator has

spelled out the standards generally followed by courts to establish risk and knowledge: "(1) the

inmate in question has threatened suicide or made a suicide attempt; (2) this threat or attempt is

known to jailers; and (3) is somewhat recent and (4) appears genuine."  James E. Robertson,

<u>Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide</u>, 24 U. Tol. L.

Rev. 807, 816 (1993).  Here, Coscia made his suicide threats directly to officers during his

seven-hour detention; nothing in the pleadings suggests facts that would make these threats

insincere or contrived.  Indeed, the officers' reaction to Coscia -- placing him in leg restraints

and noting his suicidal tendencies in police records -- suggests just the opposite.

Moreover, the indications that Coscia was suicidal were not limited to threats.  Before

entering police custody, Coscia was involved in a single-car accident, a well-known suicide

method.  <u>See generally</u> Pompili et al., <u>Suicidal Intent in Single-Car Accident</u>, 27 Crisis 92

(2006).  In police custody, and in view of police officers, he apparently tried to lick an electrical

outlet, which can fairly be described as a suicide attempt.  <u>See</u> Lindsay M. Hayes, <u>Prison</u> <u>Suicide: An Overview and Guide to Prevention</u> 78 (1995) (noting that inmates at high risk for suicide should be in rooms *without* electrical outlets).  The police saw further evidence that Coscia intended to commit suicide when he tried to bite off his handcuffs and hit and kicked the walls at the station.  <u>See</u> <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 738 (7th Cir. 2001) (stating that strange behavior may be relevant to the determination of deliberate indifference under the Eighth Amendment when combined with other facts indicating a likelihood of suicide); <u>cf.</u> <u>McKenzie v.</u> <u>Benton</u>, 388 F.3d 1342, 1355 & n.6 (10th Cir. 2004) (listing wall punching as a potential indicator of the likelihood of violent conduct or suicide in an Americans with Disabilities Act case).  Finally, the suicide evaluation form filled out by the police reflected their conclusion that Coscia was at a very high risk of suicide.

In <u>Elliott</u>, the First Circuit held that less substantial evidence of suicidal intent and notice was sufficient to deny summary judgment to police officers.  940 F.2d at 12.  In that case, the police claimed they had no actual notice of a detainee's suicide, but two fellow prisoners had signed sworn statements indicating otherwise.  <u>Id.</u> at 9.  According to those statements, the prisoners reported each of the following events to corrections officers: The decedent said "he wanted to drown himself in the toilet," asked "what would happen if he ate soap or swallowed paper towels," expressed fear about the water, banged his head against the cell bars, tried to break his neck, and told one of the other detainees that he wanted to end his life.  <u>Id.</u>  The officers said that they thought the incidents they were told about were jokes, and that the decedent had told them he was "kidding around."  <u>Id.</u> at 10.  Nevertheless, the Court held that the affidavits were sufficient to withstand a motion for summary judgment on the serious risk and

notice issues.  Id. at 11-12.  The case at bar involves similar suicidal threats and actions, and

stronger allegations of notice.  Clearly, plaintiff asserted facts sufficient to establish the first two

elements of the deliberate indifference standard.

> C.     **Failure to Act**

The amended complaint also contains allegations that could establish that the officers

failed to take obvious steps to address Coscia's suicide risk.  Under Fourteenth Amendment due

process principles, government officials cannot act with deliberate indifference to serious

medical needs, including the need to prevent a likely suicide.  Elliott, 940 F.2d at 10-11; Linden

v. Washtenaw County, 167 F. App'x 410, 416 (6th Cir. 2006).  Indeed, police officials must

provide care for pretrial detainees' serious medical needs.  See, e.g., Revere v. Mass. Gen.

Hosp., 463 U.S. 239, 244 (1983); Consolo v. George, 58 F.3d 791, 794-95 (1st Cir. 1995);

Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998).

Police officers did take some steps to respond to Coscia's statements and actions.  They

put him in leg restraints and declined to place him in a prison cell.[2]  But these actions, while

important, do not preclude a finding of deliberate indifference.  In Elliott, for example, the police

officers conducted "routine checks throughout the night" before the detainee died.  940 F.2d at

10.  Nevertheless, the Court held that a jury would still need to determine whether the officers

acted with deliberate indifference based on all the circumstances.  Id. at 12.[3]  Likewise, in Perez

---

[2] Officers also filled out a suicide risk evaluation form and recorded information about Coscia's suicidal behavior.  The mere act of recording did not address the suicide risk, and the officers apparently did not take further action based on the information collected.

[3] Bowen held that an officer's failure to remain at the police station for approximately 45 to 50 minutes after an arrest did not demonstrate deliberate indifference.  966 F.2d at 17.  However, it was clear that this action was not deliberately indifferent only because the officer had seen no indications that the detainee would commit suicide.  Id.

v. Oakland County, the Sixth Circuit concluded that a jail caseworker may violate a prisoner's

Eighth Amendment rights by moving a suicidal individual to single-cell housing without

consulting a psychiatrist.[4]  466 F.3d 416, 425 (6th Cir. 2006); see also Conn v. City of Reno, 591

F.3d 1081, 1086 (9th Cir. 2010) (Kozinski, J., dissenting from denial of rehearing en banc)

("What Clustka surely did have was a right of access to medical treatment; because Clustka

could not take herself to the doctor, the city had an obligation to make psychiatric care available

to her."); Hare v. City of Corinth, 74 F.3d 633, 642 (5th Cir. 1996) ("A serious medical need

may exist for psychological or psychiatric treatment, just as it may exist for physical ills."

(quoting Partridge v. Two Unknown Police Officers, 791 F.2d 1182, 1187 (5th Cir. 1986)).

Similarly, while the officers kept Coscia nearby, they neither offered medical care nor consulted

a mental health professional.

It is also significant that a Pembroke police order stated that detainees with suicidal

tendencies should be taken to a hospital or medical facility for evaluation.  By itself, this order

cannot create a substantive constitutional right to mental health treatment.  Wilson v. Formigoni,

42 F.3d 1060, 1066 (7th Cir. 1994); Estate of Wade v. Tompkins, 73 F. App'x 890, 894 (8th Cir.

2003).  In any case, the police officers' failure to comply with the order may be "relevant to the

deliberate indifference inquiry."  Wade, 73 F. App'x at 894.  At the least, the order makes it

more likely that it would have been obvious to the officers that Coscia needed medical attention.

Defendants correctly point out that Coscia was not constitutionally entitled to forced

mental health treatment or extended custody.  Due process obviously does not provide a right to

---

[4] Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment Due Process Clause as convicted prisoners receive under the Eighth Amendment.  See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002); Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002).

involuntary commitment.  See Collignon, 163 F.3d at 987; Wilson, 42 F.3d at 1066.  Moreover, the Constitution does not require a government entity to continue detaining a mentally ill individual for purposes of medical care.  Bynum v. City of Magee, 507 F. Supp. 2d 627, 633 (S.D. Miss. 2007).

But these principles are beside the point at this preliminary stage.  The amended complaint provides no reason to believe that the police officers would have needed to *force* Coscia to accept medical care.  It is certainly plausible that he would have accepted an offer to unshackle his legs at the police station and go to a hospital instead.  In addition, the plaintiffs do not claim that Coscia was constitutionally entitled to detention for longer than the seven hours he was in custody to facilitate a medical intervention.  They simply argue that during the time he was legitimately detained, the officers acted with deliberate indifference by leaving him at the station, without seeking medical help.

Taken together, the allegations about suicide risk, defendants' knowledge, and steps to address the risk raise a plausible claim for deliberate indifference.

### D.     Causation

Although the issue of causation is normally left to the jury,[5] it merits special mention here.  As in any suit under section 1983, the plaintiffs will need to prove that defendants' conduct was both a cause in fact and proximate cause of the harm (Coscia's suicide).  See Rodriguez-Cirilo, 115 F.3d at 52-53; see also Malley v. Briggs, 475 U.S. 335, 344-45 n.7 (1986) ("§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" (quoting Monroe v. Pape, 365 U.S. 167, 187

---

[5] See, e.g., Genereux v. Am. Beryllia Corp., 577 F.3d 350, 375 (1st Cir. 2009); Garnier v. Rodriguez, 506 F.3d 22, 27 (1st Cir. 2007); Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 837 (1st Cir. 1990).

(1961)).  Plaintiff argues that police violated Coscia's constitutional rights while he was in custody, which caused a suicide approximately thirteen and a half hours after he was released. At this stage, the estate need not prove causation by a preponderance of the evidence.  Instead, causation must be plausible on the facts as alleged.  See Chao, 630 F. Supp. 2d at 177. Assuming that defendants were deliberately indifferent in failing to offer medical care, I find that it is.

Defendants' actions would be a cause in fact of the suicide if Coscia would not have committed suicide "but for" their failure to offer medical care.  Peckham, 895 F.2d at 836.  There may well be evidence from which a jury could conclude that Coscia would have been persuaded, at the very least, to check himself into a hospital for further evaluation.  The estate could then prove proximate cause by showing that the officers' acts or omissions were a "legally significant" cause of his death, and any intervening causes were reasonably foreseeable.  Olsen v. Correiro, 189 F.3d 52, 67 n.18 (1st Cir. 1999); Rodriguez-Cirilo, 115 F.3d at 52 n.4; Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989).

The Ninth Circuit recently assessed causation under similar circumstances.  See Conn, 591 F.3d at 1092.  In Conn, police officers were potentially liable for failing to report detainee Brenda Clustka's attempt to choke herself with a seatbelt during transit to civil protective custody.  Id.  Jail personnel released her from custody a few hours after this incident.  Id. at 1093.  The following day, other police officers arrested Clustka for violating a temporary protective order.  Id.  One day later, she committed suicide using a bed sheet in her prison cell. Id.  The Court concluded that the plaintiffs (the decedent's children) had presented sufficient evidence for a jury to find in their favor.  Id. at 1091.  The children could establish cause in fact

by showing that medical personnel would have been able to prevent Clustka's suicide had she either been taken directly to the hospital or been admitted to prison under a suicide watch.  Id. at 1099-1100.  They could prove proximate cause by demonstrating that the defendants' actions were a "moving force" behind her suicide and any intervening forces (such as her subsequent detention) were foreseeable.  Id. at 1101.

In the case at bar, there was both a shorter length of time and fewer intervening events between the alleged constitutional violation and the suicide.  At the very least, the plaintiffs have presented a plausible claim that defendants' actions were a cause in fact and proximate cause of Coscia's suicide.

### E.    Liability for Harm Outside of Police Custody

The defendants contend that they cannot be liable for Coscia's suicide because it occurred outside of police custody.  However, almost all of the precedents they cite stand for a more narrow point: police liability normally "must be based on actions or inactions taken while [the detainee] was in custody."  Collignon, 163 F.3d at 987.  Accordingly, the plaintiff's theory depends on whether the officers violated Coscia's rights by failing to offer medical care *during his custody* and whether these actions caused his suicide.  In contrast, defendants' theory ignores traditional causation principles in favor of a bright line rule against liability for noncustodial suicides.  Their approach makes no sense; rather than protecting detainees from officers' deliberate indifference, it would provide perverse incentives for them to intentionally release suicidal individuals to escape liability.

To be sure, state actors usually do not have a constitutional obligation to protect citizens from injury caused by private parties.  See Deshaney v. Winnebago County Dept. of Soc. Servs.,

489 U.S. 189, 195 (1989).  Courts have recognized two exceptions to this principle: (1) the "special relationship" rule; and (2) the state-created danger theory.  J.R. v. Gloria, 593 F.3d 73, 79 (1st Cir. 2010).[6]  Under the special relationship doctrine, a government assumes affirmative duties to protect individuals when it limits their freedom, such as when it takes them into custody involuntarily.  See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005).  In effect, the special relationship exception is a different way of conceptualizing due process requirements for pretrial detainees.  See Waybright v. Frederick County, 528 F.3d 199, 207 (4th Cir. 2008) ("[W]here the state is in a special relationship to a private individual, it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard; that is why a conscious disregard of the rights of prisoners, pretrial detainees, and committed mental patients have traditionally been examined for deliberate indifference.").[7]

Clearly a "special relationship" existed during Coscia's custody after his arrest.  And that relationship gave rise to the officers' due process obligation not to act deliberately indifferent.  Whether they will ultimately be held liable then depends upon whether their actions during his custody are found by a jury to have been deliberately indifferent and to have caused his later suicide.

---

[6] Neither party argues that the state-created danger exception applies here.  See J.R., 593 F.3d at 79 n.3 (noting that the First Circuit has never found the state-created danger exception to be applicable).  Therefore, this opinion does not discuss any of the state-created danger theories at issue in the cases addressed below.

[7] See also Hasenfus v. LaJeunesse, 175 F.3d 68, 71 (1st Cir. 1999) ("The main exceptions to [Deshaney] are incarcerated prisoners or involuntarily committed mental patients for whom a unique set of rules has developed.  In such cases, failures to act . . . may comprise a due process or other constitutional violation because the state imposed circumstance of confinement prevents such individuals from helping themselves.  Liability then arises under section 1983 if the plaintiff shows that the inaction was malicious or reflected the official's 'deliberate indifference' to the welfare of the prisoner or inmate." (citations omitted)).

While the defendants refer to a number of cases in which police officers were not held liable for suicides that occurred outside of their custody, all but one are consistent with the principles described above.  For example, in Collignon, officers picked up a suicidal 28-year-old after receiving a report that he was a missing person.  163 F.3d at 985-86.  About an hour and a half later, officers released him to his father and stepmother.  Id. at 986.  He killed himself the following day.  Id.  The court rejected due process claims against the city and its officers because they had no obligation to provide involuntary commitment, and, more significantly, the decedent was not a pre-trial detainee.[8]  Id. at 991-93.  Under these circumstances, the officers did not need to seek medical care; release to his parents soon after his arrival at the police station was appropriate.  Id. at 993.  The court expressed concern that allowing the plaintiffs to pursue a deliberate indifference claim under these circumstances would "expand the rule that the state must provide medical treatment to pre-trial detainees into a rule imposing an obligation to provide medical treatment whenever the police interact with a person who turns out to have a chronic mental illness, no matter how brief that interaction."  Id. at 993.

Coscia's case is different because he *wa*s arrested -- presumably based on probable cause that he had committed a crime -- and held for seven hours.  A decision in Coscia's favor would not expand the medical treatment rule because he was a pre-trial detainee when officers failed to offer medical care.

Schoenfield v. City of Toledo presents circumstances similar to Collignon.  223 F. Supp. 2d 925 (N.D. Ohio 2002).  An apparently intoxicated individual with blood on his shirt and

---

[8] Another major theory of liability in Collignon -- based on the treatment he received from a doctor during an earlier stint in pretrial detention -- is not relevant here because Coscia did not receive any medical treatment during his time in custody.  See 163 F.3d at 986-991.

hands tried to buy a gun.  Id. at 927.  The store manager refused to sell him any firearms, and

instead called the police.  Id.  Police temporarily detained him in a parking lot, but released him

when they determined that he had not committed any crimes.  Id.  A few hours later, he bought a

gun from a different store and killed himself in a hotel room.  Id. at 928.  The court concluded

that the investigatory stop was not "custody" for purposes of Fourteenth Amendment due process

because the police had not restrained the decedent's liberty.  Id. at 930.  In contrast, the

pleadings in this case allege that Coscia was arrested, detained, and shackled at the police station

for over seven hours.  He was plainly in custody and entitled to due process protections while

there.

        In Mroz v. City of Tonawanda, police arrested a 16-year-old boy who had apparently

confronted a young woman with a starter pistol.  999 F. Supp. 436, 443 (W.D.N.Y. 1998).

According to an unsworn statement provided by a friend who was arrested during the same

incident, the boy cried after being apprehended and told the friend that he would kill himself.  Id.

at 444 & n.7.  After police took the boy to police headquarters, they decided not to charge him

because the woman refused to sign a formal complaint.  Id. at 443.  Police drove him home, and

he killed himself a few hours later.  Id. at 446.  The court granted summary judgment to the city

and its employees on the due process claim because unsworn statements can be disregarded at

the stage of summary judgment.  Id. at 457.  The court also noted that even if the friend's

statement were considered, it provided no indication that police heard the suicide threat or saw

other indications he would commit suicide.  Id. at 458.  To be sure, the court mentioned that the

boy was not in custody at his home and did not have due process protection against deliberate

indifference while there.  Id. at 457.  However, because the court found that police had

insufficient knowledge of the suicide risk during custody, it did not address the possibility that a due process violation during custody caused the later suicide.[9]

Bynum involved a mentally ill individual who first interacted with police after attempting suicide on a public highway.  507 F. Supp. 2d at 630.  Officers took him to his home and released him.  Id.  Two days later, the individual's family members requested police assistance when he threatened suicide.  Id.  Officers refused to restrain him and directed the family not to call the police for this reason again.  Id. at 630-31.  Three days after that incident, the individual killed himself by setting fire to the home.  Id. at 631.  The court held that defendants did not have a constitutional duty to maintain custody of the individual after the suicide attempt.  Id. at 633.  In addition, the court concluded that the officer could not be held liable because any special relationship terminated upon the decedent's release.  Id. at 633-34.  However, the court did not address the possibility that a due process violation during custody caused the later suicide.  In fact, there was no occasion to decide this issue because the plaintiffs argued that the decedent was entitled to continued custody, not that the defendants should have acted differently while he was already in custody.  See id. at 632-33.[10]  As a result, the reasoning in Mroz does not preclude liability here.

---

[9] The court did find that even if the officers had notice of the suicide risk, there was no causal connection between the officers' actions after his release and the boy's death.  Mroz, 999 F. Supp. at 459-60.  Since the present case involves allegations of inadequate steps before release, the court's analysis of causation regarding the officers' inability to prevent the suicide has little bearing here.

[10] It is also notable that there was a five day gap between the individual's release and his ultimate suicide, which included the substantial intervening event of an additional suicide threat to his family members.  Traditional causation principles may have prevented a judgment against officers if they could not foresee that the family members would fail to seek private help for a subsequent suicide attempt.  See generally Foradori v. Harris, 523 F.3d 477, 495 (5th Cir. 2008) (discussing intervening causes).

Townsley v. West Brandywine Township, an unpublished decision from the Eastern District of Pennsylvania, does appear to be inconsistent with the deliberate indifference analysis discussed above.  No. 06-758, 2006 U.S. Dist. LEXIS 23725 (E.D. Pa. Apr. 26, 2006).  Police arrested an individual for driving while intoxicated after he was involved in a car crash.  Id. at *1-2.  The individual then attempted to hang himself with his clothing while in a holding cell at the police department.  Id. at *2.  Officers removed the clothing but left him in his cell without offering psychiatric help.  Id.  The police then released him to a friend's custody without telling the friend about the suicide attempt.  Id.  The following morning, the individual killed himself. Id.  In the court's analysis, defendants could not be held liable because custody, and the special relationship, terminated prior to the harm.  Id. at *16-17.  Police were not responsible for protecting the individual after his release, such as by warning the friend.  Id. at *17.  In addition, the court apparently rejected the possibility that defendants could be liable for any events that occurred after release, even if their unconstitutional acts occurred during custody.  See id. at *14 ("Plaintiff asserts that Defendants had an affirmative duty to act to protect Decedent's constitutionally protected interests because Decedent was in the state's control or custody. However, the Court finds that this claim must fail because Decedent's harm occurred after the relationship between Decedent and Defendants was severed by the release of Decedent to a third-party.").[11]

---

[11] In a footnote, Townsley rejected a theory somewhat similar to the one raised here, that the defendants violated the individual's due process rights during detention because the officers took some steps to reduce the suicide risk.  2006 U.S. Dist. LEXIS 23725, at *18 n.4.  The court stated that officers could not have been deliberately indifferent because they stopped the decedent's suicide attempt and possibly prevented a subsequent attempt by removing his clothing.  Id.  This conclusion may have been incorrect.  The First Circuit has suggested that the determination of deliberate indifference requires a trial when a defendant takes some limited actions in response to a known risk.  Elliott, 940 F.2d at 12.  In any event, the amended complaint in the case at bar does not allege that police officers prevented a specific suicide attempt, only that they shackled Coscia's legs and did not place him in a cell.  Moreover, there was no indication in Townsley that officers ignored a police order regarding

This Court respectfully disagrees with the analysis in <u>Townsley</u>.  Although it may be true that officers had no obligation to protect the decedent after his release, <u>see</u> <u>Collignon</u>, 163 F.3d at 987, that does not absolve them of liability for the natural consequences of actions they took while the decedent was in custody, <u>see</u> <u>Malley</u>, 475 U.S. at 344-45 n.7.  Instead, traditional causation principles provide the appropriate limits on a government official's liability for harms that occur after a detainee has left the official's custody.  <u>See</u> <u>Conn</u>, 591 F.3d at 1098-1102.

Furthermore, a legal rule that the geographical location of a suicide is dispositive would create perverse incentives.  If officers could avoid liability by releasing suicidal detainees rather than taking steps to reduce the risk of suicide, they very well may release the detainees as soon as possible.  Under this approach, officers could encourage a detainee to commit suicide, and would not be liable as long as the suicide occurred after the detainee's release.  Of course, this outcome would be contrary to the principle of deliberate indifference.  As one court in this district explained,

> Prisoners in the United States have a right to humane treatment, including a right to adequate care for their serious medical needs. The Constitution does not protect this right because we are a nation that coddles criminals.  Rather, we recognize and respect this right because we are, fundamentally, a decent people, and decent people do not allow other human beings in their custody to suffer needlessly from serious illness or injury.

<u>Kosilek v. Maloney</u>, 221 F. Supp. 2d 156, 160 (D. Mass. 2002).  The Fourteenth Amendment Due Process Clause provides at least as much protection for pretrial detainees as the Eighth Amendment provides to convicted prisoners.  <u>Burrell</u>, 307 F.3d at 7; <u>Calderon-Ortiz</u>, 300 F.3d at 64.  Incentives to prematurely release suicidal detainees would work against the right to

---

suicidal detainees.  The claim for failure to take obvious steps is stronger here.

treatment for serious medical needs during custody.  Traditional causation principles, in contrast, encourage humane behavior during custody because any deliberately indifferent acts could lead to liability for harms occurring after release.  In sum, the act of releasing a detainee does not absolve police officers of liability for deliberately indifferent actions during custody that cause a later suicide.

### F.    Qualified Immunity

The individual defendants in this case argue that they are entitled to qualified immunity. At the stage of a motion for judgment on the pleadings, the qualified immunity doctrine protects public officials from liability when (1) the facts alleged by the plaintiff do not comprise violation of a constitutional right, or (2) the right was not clearly established at the time of the violation. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  Federal courts have discretion to address either prong first.  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).  This Court has already concluded that the pleadings state a valid claim for violation of the Fourteenth Amendment Due Process Clause.  All that remains is whether the right at issue was clearly established.

As a result, the Court must decide if the contours of the right were sufficiently clear, and if a reasonable defendant would understand that his specific conduct violated the plaintiff's constitutional rights.  Mosher v. Nelson, 589 F.3d 488, 493 (1st Cir. 2009).  The First Circuit has already concluded that it was clearly established by the early 1990s "that police officers violate the fourteenth amendment due process rights of a detainee if they display a 'deliberate indifference' to the unusually strong risk that a detainee will commit suicide."  Bowen, 966 F.2d at 16.  It was also "clearly established . . . that 'jail officials violate the due process rights of their

detainees if they exhibit a deliberate indifference to the medical needs of the detainees.'" Elliott, 940 F.2d at 10 (quoting Danese v. Asman, 875 F.2d 1239, 1243 (6th Cir. 1989)).

Furthermore, the First Circuit stated that the following, taken together, would be enough to show that an official was deliberately indifferent: (1) "an unusually serious risk of . . . self-inflicted harm"; (2) actual knowledge of that risk; and, (3) "failure to take obvious steps to address" that risk. Bowen, 966 F.2d at 17. The government official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists . . . [and] he must draw the inference." Farmer, 511 U.S. at 837. More specifically, an officer can be liable for deliberate indifference to a suicidal detainee even if he routinely checks on him throughout the night. Elliott, 940 F.2d at 10, 12. In addition, if a known risk of suicide exists, government officials may be required to offer psychological care or consult with a mental health professional. See Perez, 466 F.3d at 425; Hare, 74 F.3d at 642.

Defendants apparently contend that no reasonable officer would know they could be liable when an individual likely to commit suicide is released before committing the act, but this argument misses the point. The alleged constitutional violation occurred while Coscia was in custody. Therefore, the question is whether a reasonable defendant would have known that the conduct alleged *during Coscia's time in custody* violated his constitutional rights.[12] Elliott, 940 F.2d at 10, and Bowen, 966 F.2d at 17, provided fair warning that officers could not exhibit

---

[12] It should be noted that qualified immunity can apply even if a district court has held in similar circumstances (such as in Townsley) that defendants did not violate a detainee's constitutional rights, as long as appeals court precedents are inconsistent with the district court's conclusion. See Hope v. Pelzer, 536 U.S. 730, 747 (2002) ("[I]n applying the objective immunity test of what a reasonable officer would understand, the significance of federal judicial precedent is a function in part of the Judiciary's structure. The unreported District Court opinions cited by the officers are distinguishable on their own terms. But regardless, they would be no match for the Circuit precedents . . . .").

deliberate indifference to a substantial risk a detainee would commit suicide. When a detainee

provides clear signals that he will kill himself -- such as by announcing his intent, engaging in

self-destructive behavior, and scoring a "very high risk" on a suicide evaluation form --

reasonable officers would know that they need to take obvious steps to address that risk. In light

of the cases requiring some form of consultation with a psychologist, as well as the departmental

order requiring officers to obtain medical care for suicidal detainees, police were also on notice

that failure to offer such care may violate the detainee's constitutional rights.

As a result, the facts alleged are sufficient to preclude the defense of qualified immunity.

In any event, the Court is mindful that the police officers may be entitled to qualified immunity

later in the case if facts produced during discovery contradict (or provide relevant context for)

plaintiff's allegations. Cf. Crawford-El v. Britton, 523 U.S. 574, 593 n.14 (1998) ("[L]imited

discovery may sometimes be necessary before the district court can resolve a motion for

summary judgment based on qualified immunity.").

### G.   Supervisory Liability

Under First Circuit precedent, supervisory liability may be established if the supervisor

participates in the challenged conduct or a subordinate committed the violation and the

supervisor's action or inaction was "affirmatively linked" to the violation because it amounted to

encouragement, acceptance, or gross negligence. Bisbal-Ramos v. City of Mayaguez, 467 F.3d

16, 24 (1st Cir. 2006) (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir.

1995)). The Supreme Court, however, has since called the term "supervisory liability" "a

misnomer" and emphasized that officials are only liable for their own misconduct. Ashcroft v.

Iqbal, 129 S. Ct. 1937, 1949. Therefore, as the First Circuit has acknowledged, Iqbal may call

into question the supervisory liability standard described in <u>Bisbal-Ramos</u>.  <u>See</u> <u>Maldonado</u>, 568 F.3d at 275 n.7.  It is clear that a supervisor may be liable for a Fourteenth Amendment due process violation under section 1983 if his own actions exhibited deliberate indifference.  <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1948; <u>Chao</u>, 630 F. Supp. 2d at 178 & n.2.

        In determining whether Ohrenberger, the police chief, acted with deliberate indifference, it is appropriate to apply the same standard used for the individual defendants.  <u>See, e.g.</u>, <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 7 (1st Cir. 1998); <u>Manarite</u>, 957 F.2d at 956-57.  The risk and knowledge elements of the deliberate indifference standard would be satisfied by plaintiff's allegations because other officers told Ohrenberger about Coscia's comments and actions during custody.  Moreover, there is reason to believe that Ohrenberger failed to take obvious steps to address the risk.  As a supervisor, he knew about the order that directed officers to bring suicidal detainees to a hospital or medical facility.  (Indeed, he personally sent the departmental order to plaintiff's counsel in response to a letter requesting policy documents.  Am. Compl. ¶¶ 40-41.)  Ohrenberger nevertheless failed to direct the officers at the station to offer Coscia medical care.  Consequently, the amended complaint states a plausible claim that Ohrenberger personally violated Coscia's constitutional rights.

        **H.      Municipal Liability**

        A municipality may be subject to liability under section 1983 when a governmental policy or custom causes a constitutional violation.  <u>Martinez-Velez v. Rey-Hernandez</u>, 506 F.3d 32, 41 n.5 (1st Cir. 2007).  If policymaking officials in a municipality fail to train employees to an extent that demonstrates deliberate indifference, that failure may be considered a policy or custom for municipal liability purposes.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 388-89 (1989).

A plaintiff must prove specific deficiencies in training and either (1) policymaker knowledge of a pattern of constitutional violations, or (2) training that is obviously necessary to avoid constitutional violations. Id. at 390. The plaintiff must also prove a close causal relationship between the lack of training and the constitutional violation. Id. at 391-92.

The plaintiff contends that the municipal liability claim has been pleaded with the specificity that should be expected prior to discovery. The amended complaint alleges that the city did not train its officers to obtain medical screening for suicidal detainees or transport them to a medical facility. Am. Compl. ¶¶ 37-38. The police department had a written policy for transporting suicidal detainees, but, in response to a document request from plaintiff's counsel, did not provide any documents regarding training of employees about that policy. Id. ¶ 45.[13]  In addition, plaintiff suggests that this training would be obviously necessary in light of a "well known national problem" of detainee suicides. Id. ¶¶ 36-37. The lack of training in offering medical care to suicidal detainees allegedly caused the officers' deliberate indifference. Id. ¶¶ 51, 54.

The First Circuit has rejected municipal liability under arguably similar circumstances, but on summary judgment. In Manarite, the City of Springfield had implemented a call-in mental health network, cell block checks every half hour, and constant supervision of detainees who were known suicide risks. 957 F.2d at 959. With these policies in place, failure to train and educate officers regarding suicide prevention and detection "at most constitute[d] negligence."

---

[13] The defendants argue that the municipal liability claim should fail because the estate did not set forth the "conduct, time, place, and persons responsible for" suicide prevention policies. Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). Evancho stated that a civil rights complaint should include those elements in the context of a discussion of an individual defendant's liability. Id. Even if such particularized pleading would normally be necessary for a municipal liability claim, it would be inappropriate here because the Pembroke Police Department allegedly refused to produce documents regarding training. See Am. Compl. ¶ 48.

Id.  Moreover, the court emphasized that the officers' training met state law requirements in

1984, when the suicide occurred.  Id.

Here, the officers' actions suggest that they may have received some training regarding

suicidal detainees.  They kept Coscia under observation, performed a suicide risk evaluation, and

shackled his legs to prevent suicidal behavior.  But there is no information about what the

municipality taught officers regarding potentially suicidal detainees and whether that teaching

comported with applicable state laws.  Clearly, plaintiff has pleaded enough to meet the

"plausibility" standard and to put the defendants on notice.  No more is necessary.

**V.  CONCLUSION**

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings (document

#40) is **DENIED**.

**SO ORDERED.**

**Date:  June 4, 2010**          _/s/ Nancy Gertner_
                                  **NANCY GERTNER, U.S.D.C.**